## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
CASE NO. 07-21367-CIV-SEITZ/O'SULLIVAN

JANE DOE, et al.,

       Plaintiffs,

v.

SCHOOL BOARD OF BROWARD COUNTY,
FLORIDA, and DR. SAM SCAVELLA,

       Defendants,

_____/

### ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on Defendant Sam Scavella's ("Scavella") Motion for Summary Judgment [DE 48] and Defendant Broward County School Board's ("BCSB") Motion for Summary Judgment [DE 51]. This action stems from the alleged sexual assault of 15 year-old Plaintiff Jane Doe by her high school geometry teacher Conrad Hoever ("Hoever").[1] Jane Doe ("Doe") and her parents claim that BCSB's investigation policies, practices, and training regimen as well as Blanche Ely High School Principal Scavella's investigation inadequately addressed Hoever's past misconduct, which enabled him to continue to teach and thus proximately cause Jane Doe's sexual assault, which violated her constitutional right to bodily integrity. Defendants assert that they are entitled to summary judgment because they did not act with the deliberate indifference in response to Hoever's two prior sexual misconduct incidents, there is no policy to grant conclusive presumption of innocence to a teacher in a he

---

[1] Conraad Hoever's criminal case for the alleged sexual assault is ongoing; for purposes of its motion, BCSB does not dispute that Hoever's sexual assault deprived Doe of a federally protected liberty interest. (*See* DE 53 at 7.)

said-she said situation where there are no eye witnesses, and there was not an obvious need for additional training in sexual misconduct investigations. Having reviewed the motions, the responses and reply thereto, the entire factual record, and all legal authorities, the Court grants Defendants' motions for summary judgment because there is no genuine dispute that Defendants did not act with deliberate indifference to Hoever's alleged sexual misconduct.

## I.      Procedural History

On May 29, 2007, Plaintiffs Jane Doe ("Doe") and her parents sued Defendants BCSB and Scavella arising out of Doe's sexual assault on March 2, 2007 at Blanche Ely High School. On September 21, 2007, Plaintiffs amended their complaint to allege seven counts, the first three of which are federal claims against BCSB and the fourth a federal claim against Scavella. Count I alleges that BCSB's probable cause investigative policy establishes a "conclusive presumption" in favor of teachers thereby evincing a custom of deliberate indifference that emboldened Hoever to violate Doe's constitutional right to be free from sexual assault, and therefore BCSB is liable under 42 U.S.C. §1983. Count II avers that BCSB failed to adequately train its officials to investigate sexual misconduct complaints against teachers where there was an obvious need to do so, and thus BCSB is liable for Hoever's violation of Doe's constitutional right to be free from sexual assault under 42 U.S.C. §1983. Count III claims that: (1) BCSB was on notice that Hoever would assault Doe because of Hoever's past misconduct; and (2) BCSB's past investigations of Hoever's sexual misconduct revealed a deliberate indifference to the risk Hoever posed to Doe, and therefore BCSB violated Doe's 20 U.S.C. §1681 ("Title IX") right to be free from sexual assault. Count IV alleges that Scavella's investigation into Hoever's past misconduct demonstrated deliberate indifference to Doe's constitutional right to be free from

-2-

sexual assault, and therefore Scavella is liable under 42 U.S.C. §1983 and cannot claim qualified immunity.[2]

On Counts I, II, and III, the thrust of BCSB's argument is that BCSB did not act with deliberate indifference to the threat of Hoever's sexual misconduct. As to Count I, BCSB argues that: (1) its investigative policy does not conclusively favor teachers; (2) its prior investigations into Hoever's conduct do not amount to deliberate indifference to the threat of Hoever's sexual misconduct; and (3) BCSB's investigation into past incidents did not cause Hoever to sexually assault Doe because there is no evidence of claims against Hoever in the 21 months prior to Doe's sexual assault, and the prior incidents involved sexually suggestive conduct that is not similar to Doe's forcible attempted rape. In regards to Count II, BCSB asserts that there was no obvious need to train officials to investigate sexual misconduct. As to Count III, BCSB maintains that it did not have actual notice that Hoever would sexually assault Doe because Hoever's prior misconduct occurred 21 months prior and did not involve attempted forcible rape, and in any event, its investigations of Hoever's prior misconduct did not amount to deliberate indifference.[3]

Like BCSB, Scavella relies principally on the argument that he did not act with deliberate indifference in response to the threat of Hoever's sexual misconduct. As to Count IV, Scavella

_____

[2] The amended complaint's remaining Counts assert the following state law claims against BCSB and Scavella: (1) Count V asserts gross negligence against Scavella for failure to properly respond to prior complaints of sexual misconduct by Conrad Hoever; (2) Count VI claims negligence against BCSB for its purported failure to supervise, investigate, and take remedial action as to Hoever's activities; and (3) Count VII asserts loss of consortium against both Defendants.

[3] As to Count VII, BCSB states that it is entitled to summary judgment if Doe's parents pursue loss of filial consortium under §1983 or Title IX because loss of consortium is not a cognizable claim under those statutes, and if Doe's parents pursue loss of filial consortium under state law, they cannot recover because the record evidence does not support a finding that Doe was permanently and totally disabled.

first claims that he is entitled to qualified immunity because his conduct did not violate Doe's clearly established constitutional rights.  Second, Scavella attests that he did not act with deliberate indifference in his investigations of Hoever's prior misconduct.[4]  The Court has considered the parties' submissions and sets out below the relevant undisputed facts.  The two prior investigations at issue in this case revealed two contrasting versions of what occurred.  For purposes of this order, the Court states as fact what each participant reported.

## II.    Relevant Facts

### A.  BCSB and Hoever at Blanche Ely High School

BCSB oversees the School District of Broward County which is the sixth-largest public school district and the largest, fully accredited public school district in the nation.  (*See* DE 55, Ex. 25.)  It serves more than 258,000 students in more than 283 schools with over 36,000 employees.  (*See id.*)  On November 11, 2002, BCSB hired Hoever as a substitute teacher.[5]  (*See* DE 52 at 5.)  On December 2, 2002, Hoever became a full-time math teacher at Blanche Ely

---

[4]  Regarding Count V, Scavella claims that he did not owe Doe a duty because Doe was not a student during Scavella's tenure as principal of Blanche Ely High School.  As to Count VII, Scavella asserts that Doe's parents cannot recover for loss of consortium because Doe was not permanently disabled.

[5]  Prior to being hired, Hoever admitted to BCSB that he was convicted of a crime.  (*See* DE 66, Ex. 2 at 13.)  While BCSB's Security Clearance Committee would have investigated and subsequently approved Hoever for employment, Hoever's employment records were destroyed when a third-party archivist transferred the data to a corrupted compact disc.  (*See id.* at 14.)  Doe argues that the Court should infer that the employment records would be unfavorable to BCSB because BCSB had an affirmative duty to preserve the evidence when it reasonably anticipates litigation.  *Bowman v. American Medical Systems, Inc.*, 1998 WL 721079 *3 (E.D. Pa. October 9, 1998); *James v. U.S. Airways, Inc.*, 375 F. Supp.2d 1352, 1355 (M.D. Fla. 2005).  However, there is no evidence that the third-party's scanning of Hoever's records onto the corrupted compact disc occurred in anticipation of litigation.  The record only reflects that BCSB discovered the third-party's spoliation in August 2008.  (*See* DE 66, Ex. 2 at 14.)  Because there is no evidence that the corrupt scanning was done in anticipation of litigation, the Court cannot impose an unfavorable inference on BCSB.  *See Bowman*, 1998 WL 721079 at *3.

High School in Pompano, Florida.[6] (*See id.*)  Blanche Ely High School's school year runs from

approximately August to May of each year, and Hoever taught for the balance of the 2002-2003

school year. (*See id.* at 6.)  At the close of the 2004 school year, Blanche Ely's principal at the

time, Dr. Clint Wright, decided not to renew Hoever's annual contract because of his poor

performance. (*See* DE 66, Ex. 2 at 60-61.)  Scavella became Blanche Ely's principal for the

2004-2005 school year, and as principal, Scavella recommended to BCSB that Hoever be

reinstated for the 2004-2005 school year. (*See* DE 66, Ex. 2, at 62; DE 52 at 7.)

### B. BCSB's Investigation Policy and Procedure

BCSB's complaint investigation policy–known as the "Event/Incident Process for

Administrative Action"–governs BCSB's response to sexual misconduct complaints. (*See id.* at

3.)  According to the policy, after Scavella received a complaint, he had to conduct an on-site

investigation. (*See* DE 55, Ex. 31 at 1.)  Following the onsite investigation, Scavella had to elect

one of the following courses of action: (1) handle the incident at the site; (2) request a formal

investigation; or (3) provide notice to other appropriate agencies. (*See id.*)  To request a formal

investigation, Scavella had to contact BCSB's Special Investigative Unit ("SIU"). (*See id.*)

Following Scavella's request, SIU's executive director Dr. Joe Melita must determine: (1)

whether he should refer the complaint back to Scavella to resolve at the school; or (2) if he

should authorize an investigation and assign an investigator to the case. (*See id.*)  SIU is

comprised of 18 investigators who conduct between 260 and 300 formal investigations annually.

(*See* DE 55, Ex. 18 at 8-10; DE 55, Ex. 15 at 2.)  After the investigator generates the report, the

---

[6] On December 4, 2002, Hoever signed an acknowledgment that he read the Code of Ethics of the Education Profession in Florida and the Principles of Conduct for the Education Profession in Florida. (*See* DE 55, Ex. 44.)

investigator must submit the report to the SIU Review Committee. (*See* DE 55, Ex. 31 at 1.)

The SIU Review Committee can elect to close the investigation or submit the investigation to BCSB's Professional Standards Committee ("PSC"). (*See id.*) The PSC, made up of approximately fourteen BCSB employees with knowledge of BCSB's Code of Ethics and Principles of Professional Conduct, reviews the investigative findings and affords the accused employee an opportunity to address the allegations. (*See id.* at 2.) If probable cause is found, the PSC recommends a punishment to the Superintendent, such as termination.[7] (*See id.*) If PSC does not find probable cause that the teacher committed the alleged misconduct, the case is closed, and the employee returns to the work site. (*See id.*)

### C.  K.F. Incident[8]

In 2004, K.F. was an eleventh grade student at Blanche Ely High School and was assigned to Hoever's geometry class. (*See* DE 52 at ¶ 17.) According to K.F., on or about Thursday, August 26, 2004, she came to Hoever's classroom after class to ask for assistance with the geometry subject matter. (*See id.*) K.F. alleged that Hoever told her she was "beautiful," "sexy," and had a "beautiful smile," after which she attempted to leave the classroom. (*See id.*) According to K.F., as she was leaving, Hoever gave her his phone number. (*See id.*) Hoever allegedly told her that she could call him if she ever missed class and he would update her on the day's lesson. (*See id.*)

K.F. claimed that on Monday, September 6, 2004, Hoever asked to speak with her after

---

[7]  To find probable cause, PSC must find that it is more likely than not that the alleged incident took place. (*See* DE 55, Ex. 15 at 20.)

[8]  Initials have been used to reference the minor students involved in the two prior Hoever incidents to protect their privacy.

class and told her that he loved her and wanted to do "business" with her. (*See* DE 55, Ex. 11 at 14-16.) According to K.F., when she inquired as to what type of "business," he replied that she was beautiful, that she should have someone to take care of her, and that she should be his girlfriend. (*See id.* at 16.) Before she left his classroom, K.F. said Hoever approached her, lifted the front of her shirt up exposing her stomach, and commented on her physique. (*See id.* at 18-19.) On Wednesday September 8, 2004, K.F. claimed she attempted to secretly record Heover's statements, but was unsuccessful. (*See id.* at 25-27; Ex. 12 at 48.) K.F. did not report Hoever's misconduct for six weeks.[9] (*See id.* Ex. 11 at 38-39.)

On October 21, 2004, Hoever referred K.F. out of his class after she disputed the "D" grade he gave her. (*See id.*) K.F. alleged that Hoever would give her a "D" unless she did "business" with him. (*See* DE 73 at 7.) That day, K.F. reported Hoever's conduct to Scavella. (*See id.*) After listening to K.F.'s report, Scavella instituted an on-site investigation and told K.F. to draft a written statement. (*See id.* Ex. 22 at 71-72.) Scavella also informed Hoever of K.F.'s allegation and obtained his written statement. (*See id.*) In his written statement, Hoever denied making any inappropriate sexual advances. (*See* DE 73 at 2.) He stated that he removed K.F. from his class for being disruptive. (*See* DE 55, Ex. 30.) Hoever admitted that on one occasion, K.F. asked him to find a sponsor for her modeling career, and in response he stated that she was "tall, slim, and sexually appealing" for the job, but that finding her a sponsor was "strictly business." (*See* DE 66, Ex. 3 at 6.)

---

[9] BCSB represents that they provide students a copy of the Code of Student Conduct ("Code"), however there is no evidence in the record to show that K.F. and S.W. received a copy of the Code. (*See* DE 55, Ex. 43.) Pursuant to the Code, students subject to harassment may report misconduct through a formal and informal procedure. (*See id.* at 34.-35.) The informal procedure allows students to contact the Director of Educational Opportunities while the formal process allows students to file a grievance form with their school's principal. (*See id.*)

-7-

Following his on-site investigation, Scavella elected to contact SIU to request a formal investigation. (*See* DE 55, Ex. 22 at 76.) Scavella formalized the request in a Personal Investigation Request which classified the incident as "sexual harassment." (*See* DE 55, Ex. 30 at 16.) The request noted that K.F. accused Hoever of making sexual advances. (*See id.*) On November 9, 2004, SIU executive director Dr. Joe Melita assigned the investigation to Jim Wollschlager ("Wollschlager").[10] (*See id.* at 5.) SIU also: (1) notified Hoever of the investigation; (2) ordered him to refrain from contacting K.F. or anyone related to the investigation; (3) removed Hoever from Blanche Ely High School and placed him on administrative leave; and (4) prohibited Hoever from returning to Blanche Ely High School. (*See id.* at 17-21.)

In conducting his investigation, Wollschlager obtained sworn taped statements from both K.F. and Hoever. (*See id.* at 3-5.) Wollschlager also met with Maria Avallaneda and Rivelinio Serin, two of K.F.'s classmates, who stated that they could not recall K.F. speaking with Hoever after class. (*See id.* at 7.) Wollschlager decided against interviewing K.F.'s friend, cousin, and guardians because they had no first-hand knowledge of the incident and could only say what K.F. told them. (*See* DE 66, Ex. 1 at 43.) On January 25, 2005, Wollschlager submitted his report to SIU. (*See* DE 52 ¶ 26.) Robert Dinkle, a senior staff member at SIU, reviewed the report which was sent to the PSC. (*See id.*) On February 16, 2005, the PSC met. (*See id.* ¶ 27.) Hoever was present with his counsel. (*See id.*) The PSC recommended that no probable cause existed for K.F.'s allegation. (*See id.*) Pursuant to BCSB policy, Hoever returned to teaching at Blanche

---

[10] Wollschlager, who began with SIU in 2004, had 25 years experience as a police officer with the Town of Davie Police Department. (*See* DE 55, Ex. 18 at 5.)

-8-

Ely High School in the second semester of the 2004-2005 school year. (*See id.*)

### D. S.W. Incident

Upon his return, Hoever taught an algebra class in which S.W. was a student. (*See* DE 55, Ex. 34.) According to S.W., on May 31, 2005, she and two other students were listening to music at Hoever's desk during class. (*See id.*) Eventually, the other students departed, and Hoever began making S.W. a compact disc of music when he brushed his hand across S.W.'s leg while reaching for her hand. (*See id.*; DE 66, Ex. 2 at 6.) According to S.W., when S.W. and Hoever were alone, Hoever asked her if she wanted him to write her a pass to stay with him for the next period. (*See* DE 55, Ex. 34.) Hoever allegedly commented that she "seem[ed] very grown up," and that he liked "how soft her hands feel," and liked "how [her] lips look[ed]." (*See id.*)

Hoever then purportedly approached S.W. and requested that she raise her shirt so he could see her stomach. (*See id.*) As S.W. began to leave, Hoever followed offering her a music compact disc which she accepted. (*See id.*) S.W. reported the incident immediately. (*See id.*) In her statement, S.W. stated that on a prior occasion, Hoever, in response to her question about an algebra problem, inquired about her weekend plans and asked if she wanted to "ride around with him." (*See id.*)

Scavella instituted an on-site investigation, obtaining statements from other students and from Hoever. (*See* DE 55, Ex. 23 at 98-100.) Scavella found that none of the other students' statements corroborated S.W.'s allegation. (*See id.* at 103.) Scavella did not interview one of S.W.'s friends named Naomi, who left Hoever's classroom before the incident. (*See* DE 66, Ex. 2 at 6.) Scavella then phoned Joe Melita at SIU and briefed him on S.W.'s complaint. (*See* DE

50, Ex. 2 at 110.)  Scavella discussed the case, including the written statements, and Scavella disclosed that he didn't believe the evidence supported S.W.'s complaint. (*See* DE 66, Ex. 1 at 18; DE 55, Ex. 23 107-108.)  Melita testified that Scavella did not inform him that Hoever was the teacher involved.[11]  (*See* DE 66, Ex. 1 at 18.)  Scavella ultimately determined that the evidence did not support a finding that sexual misconduct occurred and further investigation was not warranted.  (*See* DE 55, Ex. 23 at 107-108, 114; DE 66, Ex. 1 at 54.)  He decided to handle the situation on-site by giving Hoever a letter of reprimand which admonished Hoever's use of class time for making music compact discs, and placing the letter in Hoever's file. (*See* DE 55, Ex. 23 at 107-108.)

### E.  The Doe Incident

As the 2004-2005 school year ended, Scavella resigned as Blanche Ely's principal. (*See* DE 66, Ex. 4 at 9.).  Before resigning, Scavella recommended that Hoever be retained. (*See* DE 55, Ex. 23 at 114.)  For the following 21 months, the record contains no complaints against Hoever until the spring semester of the 2006-2007 school year. (*See* DE 73 at 3; DE 52 at 11.)  On March 2, 2007, Jane Doe testified that Hoever sexually assaulted her in a classroom at Blanche Ely.[12]  (*See* DE 52 ¶ 38.)  After the assault, Doe fled to her next class where she told her teacher, Djuana Robinson. (*See id.* ¶ 46.)  Robinson escorted Doe to the front office, and Doe's parents were contacted. (*See id.* ¶ 48.)  Doe went to the local police station where she gave a recorded statement, and the police took her to the Sexual Assault Treatment Center an hour and a

---

[11]  Scavella declared that he is unsure of whether he told Melita that the accused teacher was Hoever. (*See* DE 55, Ex. 23 at 101.)

[12]  At the time, Doe was assigned to Hoever's math class. (*See* DE 52 ¶ 38.)  Prior to the incident, Doe had never been the target of, nor witnessed, any conduct on Hoever's part she felt was sexually offensive or inappropriate. (*See id.* ¶ 39.)

half later. (*See id.*) That day at 4:00 p.m., officers from the Broward County Sheriff's Office arrested Hoever and charged him with two counts of sexual battery. (*See id.* ¶ 49.)

Wade Edmond, the then principal at Blanche Ely, requested an SIU investigation. (*See id.* ¶ 50.) Joe Melita authorized the investigation and, on March 5, 2007, SIU investigator Fred Davenport was assigned to the investigation. (*See id.*) Pursuant to BCSB policy, Hoever was placed on administrative leave during the investigation. (*See id.*) Davenport concluded his investigation on May 22, 2007; the PSC met on June 27, 2007 and found probable cause of Hoever's unethical conduct and recommended termination. (*See id.* ¶ 51.) On January 15, 2008, BCSB Superintendent James Notter initiated termination proceedings, and on February 12, 2008, the BCSB terminated Hoever. (*See id.* ¶ 52.)

## III.    Relevant Standards

### A. Summary Judgment

Summary judgment is appropriate when "the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## B. §1983

A violation of 42 U.S.C. §1983 occurs when a person suffers a deprivation of rights secured by the United States Constitution or other federal laws by one acting "under color of any state statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Colombia." 42 U.S.C. §1983; *see also Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). As the Supreme Court has made clear, however, a local government cannot be held vicariously liable under 42 U.S.C. §1983 for the actions of its employees. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)). Rather, to state a claim under 42 U.S.C. § 1983 against a municipality, a plaintiff must show that the constitutional violation occurred directly because of a policy or custom of that municipality. In *Brown*, the Supreme Court explained:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.

-12-

> Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997) (citations omitted). In addition to identifying conduct attributable to a municipality, it must be shown that the "municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Davis v. Dekalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir.2000) (citing *Brown*, 520 U.S. at 407).

Inadequate training may be an actionable policy or custom under §1983 where "a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . ." *City of Canton*, 489 U.S. at 388-89. To establish that a municipality's training was deliberately indifferent, a plaintiff must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Without "evidence of a history of widespread prior abuse," a municipality is deemed on notice of a need to train only if the need is "so obvious" that liability attaches for failure to train in a single incident. *Gold*, 151 F.3d at 1351 (citations omitted).

**C. Title IX**

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance . . . ." 20 U.S.C. §1681(a).  In cases

involving intentional sexual discrimination, the Supreme Court has found an implied right of

action where money damages are available.  *Franklin v. Gwinnett County Public Schs.*, 503 U.S.

60, 65 (1992).  A teacher's sexual harassment of a student constitutes actionable discrimination

for the purposes of Title IX.  *Id.* at 74-76; *see also Davis*, 233 F.3d at 1371.

However, the school district will not be liable in damages under Title IX for a teacher's

sexual harassment "unless an official of the school district who at a minimum has authority to

institute corrective measures on the district's behalf has actual notice of, and is deliberately

indifferent to, the teacher's misconduct."  *Gebser v. Lago Vista Independent School District*, 524

U.S. 274, 277 (1998).  In order to survive summary judgment, a plaintiff in a Title IX action must

establish the following: "(1) a school district official with the authority to take corrective

measures had actual notice of the harassment; and (2) the official with such notice was

deliberately indifferent to the misconduct."  *Sauls v. Pierce County School Dist.*, 399 F.3d 1279,

1284 (11th Cir. 2005); *see also Gebser*, 524 U.S. at 287-89 (holding that actual notice is

required).  The Eleventh Circuit uses the same "deliberate indifference" inquiry for both §1983

and Title IX claims.  *See Sauls*, 399 F.3d at 1288; *Davis*, 233 F.3d at 1376.

## IV.    Discussion

### A. Count III - Title IX Discrimination Against BCSB

To be held liable for Title IX sex discrimination, BCSB must have had actual notice of

the misconduct, and must also have been deliberately indifferent to the misconduct.  *Gebser*, 524

U.S. at 287-89.  BCSB asserts that it was not on actual notice of Hoever's alleged misconduct

because: (1) Hoever did not harass Doe prior to the March 2, 2007 incident; (2) for nearly two

-14-

years prior to the March 2, 2007 incident, there is no evidence of any complaints against Hoever; and (3) the K.F. and S.W. complaints were not actionable after investigation and did not involve the type of conduct Doe alleges.[13]  BCSB also maintains that it did not act with deliberate indifference to Hoever's misconduct.  Doe responds that notice of Hoever's conduct with K.F. and S.W. suffices for Title IX liability and BCSB's response to those incidents evinced deliberate indifference to the threat of sexual harassment of students.  However, because BCSB did not act with deliberate indifference to its students' security, Doe's Title IX claim does not satisfy a necessary element and therefore requires summary judgment for BCSB.

While, in retrospect, BCSB missed opportunities to better secure its students, "a school district is not deliberately indifferent simply because the measures it takes are ultimately ineffective in stopping a teacher from harassing [students]." *Sauls*, 399 F.3d at 1284 (citing *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 456 n. 12 (5th Cir.1994).[14]  To be actionable, BCSB's conduct in response to reports of misconduct must have been "clearly unreasonable in light of the known circumstances." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999).

---

[13]  Because BCSB did not act with deliberate indifference, it is not necessary to reach the issue of whether BCSB had actual notice of Hoever's misconduct. *See Sauls*, 399 F.3d 1285. However, based on *Gebser*, the two prior incidents did not provide actual notice. In *Gebser*, the Supreme Court held that a complaint about inappropriate comments was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." *Gebser*, 524 U.S. at 291. While the prior complaints here involved inappropriate conduct, they differ substantially from Doe's violent sexual assault. Further, Doe admits that Hoever did not harass her prior to this assault. (*See* DE 52 ¶ 39.)

[14]  In *Doe*, the Fifth Circuit stated that "there are many courses of action open to a school official that negate deliberate indifference but do not expose the official to liability on grounds of taking premature disciplinary action against a state actor." *Doe*, 15 F.3d at 456 n.12. The court remarked that such possible courses of action include "reporting the information to a superior; or []advising a subordinate state actor of rumors or information that the official has received and warning the actor that severe disciplinary action will be taken if the rumors are confirmed; or if plausible information of misconduct continues to come to his attention to investigate such information; or if disputes arise as to the reliability of that information, to hold a hearing-closed door, if justified-to resolve such disputes." *Id.*

-15-

Indeed, where BCSB takes actions that are "proactive, even if ultimately ineffective," it cannot be said to act with deliberate indifference. *A.G. ex rel. K.C. v. Autauga County Bd. of Educ.*, 506 F.Supp.2d 927, 939 (M.D. Ala. 2007).

In *Sauls*, the Eleventh Circuit held that, even though the school district failed to prevent a teacher's sexual relationship with her students, it did not act with deliberate indifference because: (1) school officials responded to the three complaints by investigating the allegations and interviewing the relevant parties; and (2) school officials took corrective measures including issuing oral and written warnings. *Sauls*, 399 F.3d at 1285-86. In response to the first complaint alleging that the teacher engaged in several inappropriate relationships with her students, the school official interviewed both the student and teacher, and despite receiving denials from both, the principal issued a warning letter to the teacher. *Id.* Over two years later, an anonymous complaint came to the same official, who, after the teacher denied any wrongdoing, then "admonish[ed] [the teacher] both orally and in writing, and directed her to avoid even the appearance of impropriety when dealing with students." *Id.* After a third complaint, school officials discovered a love note from the student and upon receiving this "concrete evidence of an inappropriate relationship," the officials confronted the teacher who resigned. *Id.* at 1287. Based on the school officials' course of conduct, the court held that the appellant could not demonstrate that the officials acted with deliberate indifference. *Id.* at 1285.

Likewise, in *Bailey v. Orange County School Board*, 2006 WL 2092267 *2 (M.D. Fla. 2006) *aff'd*, 222 Fed. Appx. 932 (11th Cir. 2007), the court held that the school board did not act with deliberate indifference even given actual notice of illicit proclivities because, although its investigations of the two prior student complaints found insufficient evidence that sexual

-16-

misconduct had occurred, it nevertheless conducted swift and purposeful investigations in response to the complaints. *Id.* at *12. In response to both complaints, school officials instituted an investigation, placed the teacher on administrative leave pending the investigation's outcome, and after determining that the investigation's results were inconclusive, allowed the teacher to return but warned him about the conduct after the first complaint and reprimanded him after the second. *Id.*

By contrast, the *A.G.* court denied summary judgment for the Board of Education because there was a factual issue as to whether the superintendent, having actual notice of a substitute school teacher's misconduct at an intermediate school on October 20, 2004, acted with deliberate indifference to the substitute's conduct when the superintendent did nothing prior to October 29, 2004 to: (1) ensure that the schools in his district received an updated available substitute list; (2) ensure that schools did not use the list on which the substitute's name appeared; and (3) direct all principals and teachers to avoid contacting the substitute for teaching duty.[15] *A.G.*, 506 F.Supp.2d at 931, 939. In *A.G.*, after corroborating several inappropriate touching complaints, there was sufficient concern about the substitute teacher's conduct that the school district: (1) removed him from the school; (2) contacted the school district's attorney to determine whether the substitute could be removed from the substitute teacher list; (3) removed the teacher from the list; and (4) produced a written report regarding the incident. *Id.* Nonetheless, the school district failed to ensure that the updated list without the substitute's name was distributed to area schools and failed to disclose to an inquiring school official the reasons the substitute was removed from

---

[15] While finding factual issues existed whether the school superintendent and personnel director acted with deliberate indifference to reports of misconduct, the court nonetheless found that the superintendent and personnel director were entitled to qualified immunity. *A.G.*, 506 F.Supp.2d at 942.

the intermediate school or that an updated substitute list was available. *Id.* This allowed the substitute to appear at two area schools over the course of nine days, even though the school district was aware that, five days after the intermediate school incident, the substitute was found at an area high school because the parent of one of the children in the intermediate school shared that incident with her colleague who brought it to the high school principal's attention. *Id.*

In this case, BCSB's investigation of the K.F. and S.W. incidents adhered to BCSB's official complaint policy and procedures under the Process for Administrative Action. (*See* DE 55, Ex. 31.) In the K.F. incident, once the complaint was taken, Scavella: (1) confronted Hoever about the allegations against him; (2) obtained Hoever's statement; and (3) involved SIU. (*See id.*, Ex. 22 at 71-72, 76.) When SIU began its formal investigation, it took the following actions: (1) removed Hoever from Blanch Ely and prohibited him from contacting anyone at the school; (2) obtained sworn statements from both Hoever and K.F.; (3) interviewed two other students, whom SIU ultimately concluded had no relevant information; and (4) submitted its report to the PSC for a determination as to whether there was probable cause that Hoever committed the alleged acts. (*See* DE 52 ¶¶ 26, 27.) The PSC determined that it was more likely than not that Hoever did not commit the alleged misconduct, and Hoever returned to his position at Blanche Ely. (*See id.*)

Doe attempts to distinguish *Sauls* from the present case by arguing that: (1) K.F.'s friend, cousin, and guardians should have been interviewed; (2) the finding of no probable cause based on the investigation evinces a custom of disbelieving students; and (3) that measures were not taken at the school level when K.F. lodged the complaint. However, as the officials did in *Sauls* and *Bailey*, BCSB set out to determine whether there was "concrete evidence of misconduct."

-18-

*Sauls*, 399 F.3d at 1287. To that end, BCSB officials performed two separate investigations, one on-site, and one conducted by SIU. As a precautionary measure, BCSB removed Hoever from the school and prohibited him from contacting anyone at the school during SIU's investigation. As it happened, there were no witnesses to the acts alleged in K.F.'s complaint, and the individuals whom, according to Doe, should have been interviewed were determined to lack evidentiary value because they could not corroborate the allegations; rather, they could only say what K.F. told them. To be sure, the statements of K.F.'s friend and family might have been useful in assessing K.F.'s credibility, however, their statements could not verify K.F.'s misconduct claim. Like *Bailey*, after a formal investigation, BCSB found a lack of probable cause, and only then did they permit Hoever to return to teaching. BCSB's investigation, precautionary measures, and subsequent application of a probable cause standard based on the evidence gathered does not amount to a custom of deliberate indifference.

Scavella also adhered to BCSB procedure in the S.W. incident by deciding to deal with the situation on-site. After receiving S.W.'s written statement, Scavella began an on-site investigation which included: (1) confronting Hoever and obtaining his handwritten statement; (2) interviewing S.W.'s classmates; and (3) speaking with Joe Melita and briefing him on the complaint. (*See* DE 55, Ex. 23 at 98-100, 103; DE 50, Ex. 2 at 110.) After briefing Joe Melita, Scavella handled the complaint on-site by informing Hoever of the reprimand for inappropriate use of class time and placing a letter of reprimand in Hoever's file for inappropriate use of classroom time. (*See* DE 55, Ex. 23 107-108.)

Doe takes issue with Scavella's failure to interview S.W.'s friend Naomi and failure to explain to Melita that S.W. accused Hoever. However, these two failures do not create a

-19-

question of deliberate indifference under Title IX. Scavella's failure to interview Naomi was not deliberately indifferent because she could not corroborate S.W.'s complaint as she was not present. (*See* DE 66, Ex. 2 at 6.) Further, Scavella was not "clearly unreasonable" for failing to inform Melita that S.W. accused Hoever in light of the evidence collected from the on-site investigation. *A.G.*, 506 F.Supp.2d at 939. To be sure, Melita would have recommended that SIU institute a formal investigation had Scavella told him that S.W. accused Hoever.

However, to assert that an SIU investigation would have had a different outcome based upon the evidence is speculative. There was no physical or eye-witness evidence to corroborate S.W.'s claim. Furthermore, for the next 21 months, there was no evidence of Hoever's misconduct. Indeed, until the assault on March 2, 2007, there was no indication to anyone, including Doe, that Hoever might engage in sexual assault. (*See* DE 52 ¶ 39.) While, in retrospect, BCSB could have devoted one of SIU's 260 to 300 annual investigations to S.W.'s complaint, it did not act with deliberate indifference by failing to do so. (*See* DE 55, Ex. 25; DE 55, Ex. 15 at 2.) Unlike the school district's response in *A.G.*, there were policies and procedures to investigate such incidents, an investigation was conducted, but there was no corroboration of S.W.'s claim, and for the next 21 months, no evidence of Hoever's sexual misconduct towards any student, including Doe, such that BCSB's actions ignored a persistent threat to its students. Further, like *Sauls* and unlike *A.G.*, Scavella confronted Hoever, obtained statements from each student who lodged complaints against Hoever, and informed SIU of the sexual misconduct allegations. Additionally, like *Sauls* and *Bailey* and according to BCSB procedure, Scavella made a determination as to how to proceed in light of the evidence presented.

Actions such as those alleged against Hoever are despicable abuses of power and

-20-

extremely harmful to children, their parents and the community.  However, the law does not hold BCSB and Scavella responsible on a respondeat superior theory.  *City of Canton*, 489 U.S. at 385.  The issue before the Court is whether the evidence can support a reasonable finding that BCSB acted with deliberate indifference.  Because the evidence does not permit such a finding, BCSB is entitled to summary judgment as to Count III.

### B.  Count I - §1983 Policy or Custom of BCSB

To impose §1983 liability against BCSB, BCSB must have an official policy or custom that evinced deliberate indifference to Hoever's misconduct.  *Davis*, 233 F.3d at 1375-76.  BCSB asserts that there is no official policy that condones teachers' sexual misconduct with students.  BCSB also maintains that its investigation of the K.F. and S.W. complaints do not demonstrate deliberate indifference to the welfare of its students.  On the other hand, Doe maintains that BCSB's investigations of the K.F. and S.W. incidents established a custom of deliberate indifference that emboldened Hoever to allegedly commit the March 2, 2007 sexual assault.  Specifically, Doe challenges BCSB's application of the probable cause standard in the K.F. complaint and Scavella's decision to handle the S.W. complaint on-site.

However, as discussed in section IV.A. above, BCSB did not act with deliberate indifference to the welfare of its students in applying its policies and procedure to the investigation of the K.F. and S.W. complaints.  In response to K.F.'s complaint, Scavella, SIU, and the PSC adhered to BCSB procedures, and Scavella: (1) took K.F.'s and Hoever's statements; and (2) requested an SIU investigation.  (*See id.*, Ex. 22 at 71-72, 76.)  SIU then: (1) removed Hoever from Blanche Ely and prohibited from contacting anyone at the school; (2) obtained sworn statements from both Hoever and K.F.; (3) interviewed K.F.'s classmates; and (4)

-21-

submitted its report to the PSC to determine whether it was more likely than not that the alleged

sexual misconduct occurred.  (*See* DE 52 ¶¶ 26, 27.)  In light of the evidence presented the PSC

found no probable cause, and afterwards, Hoever returned to Blanche Ely.  (*See id.*)

In response to S.W.'s complaint, Scavella again adhered to BCSB procedure.  Scavella:

(1) obtained S.W.'s written statement; (2) confronted Hoever with the allegation and obtained his

written statement; (3) interviewed S.W.'s classmates; and (4) briefed Dr. Joe Melita on the

complaint.  (*See* DE 55, Ex. 23 at 98-100, 103; DE 50, Ex. 2 at 110.)  As discussed above, while

Scavella's briefing to Melita failed to mention that S.W. accused Hoever, Scavella's omission

does not demonstrate deliberate indifference.  While, in hindsight, the school officials' actions

were ineffective, in neither case is there evidence that BCSB had a custom or policy of

"conclusive presumption" as to the lack of veracity of its students.  Indeed, in each case, the

record demonstrates BCSB made good faith attempts to investigate each complaint and take

appropriate actions under the circumstances.  Therefore, BCSB is entitled to summary judgment

as to Count I.

### C. Count II - §1983 Inadequate Training by BCSB

In Count II, Doe asserts that: (1) BCSB failed to adequately train and supervise its

employees with regard to investigation and response to students' sexual misconduct complaints

lodged against teachers; (2) the need to train was so obvious that BCSB is liable for a single

incidence of a failure to train; and (3) the failure to train caused Doe's purported sexual assault.

However, when viewing the facts in the light most favorable to Doe, BCSB is entitled to

summary judgment because there is no genuine issue of fact that the need to train was so obvious

and pervasive as to constitute deliberate indifference to its students' security.

To establish that BCSB's training was deliberately indifferent, Doe must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold*, 151 F.3d at 1350. Without "evidence of a history of widespread prior abuse," which Doe does not argue is this case, BCSB can only be deemed on notice of a need to train if the need is "so obvious" that liability attaches for failure to train in a single incident. *Gold*, 151 F.3d at 1351 (citations omitted). "[T]he Supreme Court has given only a hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." *Gold*, 151 F.3d at 1352 (citations omitted).

In this case, there is no evidence of an obvious need that would support a finding of deliberate indifference.[16] The record reflects two prior sexual misconduct complaints nearly two years prior to the incident here. Unlike the armed police hypothetical the Supreme Court poses, the record bears no widespread threat of teachers violating the constitutional rights of students such that there is an obvious need for further training to investigate sexual assaults.[17] Furthermore, BCSB provides a set of procedures known as the Process for Administrative Action to guide school administrators when presented with complaints against teachers. (*See* DE 55, Ex. 31.) There is no dispute that Scavella, SIU, and the PSC adhered to the Process for Administrative Action when handling the K.F. and S.W. complaints. For a reasonable juror to

---

[16] *See City of Canton*, 489 U.S. at 396-97 (finding no obvious need for police officers to be trained in diagnosing mental illness) (O'Connor, J., concurring in part and dissenting in part); *Young v. City of Augusta, Georgia*, 59 F.3d 1160, 1171-72 (11th Cir.1995) (finding no obvious need to train jail employees "to recognize the need to remove a mentally ill inmate to a hospital or to dispense medication as prescribed").

[17] Having said this, every lawsuit offers an opportunity to assess past approaches and determine if procedural improvements can be made.

find for Doe on this claim, given the facts of the case even in the light most favorable to Doe, would subject BCSB to respondeat superior liability because there might have been something BCSB could have done to prevent the sexual assault.  Therefore, the Court will grant BCSB's motion as to Count II.

### D.  Count IV - §1983 liability against Scavella

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir.2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In analyzing such claims, the first issue is whether the government official "was acting within the scope of his discretionary authority when the allegedly wrongful actions occurred."  *Id.* (citations omitted).  The second issue is, assuming Plaintiff's allegations are true, do they "establish a constitutional violation."  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Where, as here, the Plaintiff asserts a constitutional violation by a government official in a supervisory role, §1983 liability attaches

> when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation.  The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.

*Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999) (quoting *Brown v. Crawford*, 906 F.2d

667, 671 (11th Cir.1990)).  Plaintiff may also establish a causal connection if the supervisor's improper "custom or policy . . . results in deliberate indifference to constitutional rights." *Id.* (quoting *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir.1991)).  Where a supervising official is "deliberately indifferent" to a known risk of harm, he is not entitled to qualified immunity. *Nichols v. Maynard*, 204 Fed. Appx. 826 * 2 (11th Cir. 2006).

Scavella asserts that he is entitled to qualified immunity because his conduct did not violate Doe's clearly established constitutional rights and that his response to the K.F. and S.W. complaints did not evince deliberate indifference to Hoever's purported misconduct.  In response, Doe contends that Scavella's investigation of the K.F. and S.W. incidents and the fact that Scavella recommended that Hoever be retained as a teacher prior to these incidents and given a contract after these incidents establishes that he acted with deliberate indifference to the rights of his students.  However, the K.F. and S.W. incidents do not rise to the level of a "history of widespread abuse" such that Scavella was on notice of Hoever's misconduct. *Hartley*, 193 F.3d at 1269.  As discussed above, in K.F.'s case, Scavella: (1) took K.F.'s and Hoever's statements; and (2) requested an SIU investigation. (*See id.*, Ex. 22 at 71-72, 76.)  After SIU's investigation, the PSC determined that the evidence did not show that it was more likely than not that Hoever committed the alleged misconduct. (*See* DE 52 ¶¶ 26, 27.)  In S.W.'s case, Scavella: (1) obtained S.W.'s written statement; (2) confronted Hoever with the allegation and obtained his written statement; (3) interviewed S.W.'s classmates; and (4) briefed Dr. Joe Melita on the complaint. (*See* DE 55, Ex. 23 at 98-100, 103; DE 50, Ex. 2 at 110.)  Based on the available evidence, it was determined that the evidence did not show cause for further investigation. (*See* DE 55, Ex. 23 at 107-108, 114; DE 66, Ex. 1 at 54.)  Scavella handled S.W.'s complaint on-site

-25-

by giving Hoever a letter of reprimand and placing it in his file. (*See id.*)

For the next 21 months, including the remainder of Scavella's tenure, the record reflects no further complaints against Hoever. Indeed, prior to Doe's assault on March 2, 2007, there is no indication that Hoever ever took any sexually inappropriate action toward Doe. (*See* DE 52 ¶ 39.) When viewed in the light most favorable to Doe, no reasonable juror could find that the two incidents preceding Doe's deprivation amount to a "history of widespread abuse" such to notify Scavella that it was obvious that Hoever might sexually assault a student. *Hartley*, 193 F.3d at 1269. In that light, Scavella's recommendation to retain Hoever for the 2004-2005 school year and subsequent offer to Hoever to teach for the 2005-2006 school year do not evince a custom or policy of deliberate indifference to Doe's constitutional right to be free from sexual assault such that there is a causal connection between Scavella's actions and Doe's deprivation. *Id.* While Doe is entitled to critique Scavella's investigative, disciplinary, and personnel measures in retrospect, the steps he took cannot be said to have caused Doe's deprivation.[18] Therefore, the Court must grant Scavella's motion as to Count IV.

Doe and her parents also assert Florida state law claims of: (1) gross negligence against Scavella; (2) negligence against BCSB; and (3) loss of filial consortium against both Defendants. Because the Court dismisses Doe's federal causes of action, it declines to exercise supplemental jurisdiction over these claims. 28 U.S.C. §1367.

_____

[18] In this regard, *H.A.L., et al. v. Foltz* 2008 WL 5204801 (11th Cir. December 15, 2008) is inapposite for two reasons. First, the Eleventh Circuit decided only that the plaintiff had met its burden at the pleading stage as to qualified immunity; it was not presented with the case on summary judgment. *Id.* at *5. Second, plaintiffs there alleged defendants placed children in a foster home despite their knowledge that the children were at risk of sexual abuse. *Id.* By contrast, Scavella made good faith investigations into the complaints against Hoever, but in neither case was the evidence sufficient to support the allegations of sexual misconduct that were not of the same nature as the sexual assault in Doe.

## V.    Conclusion

For the reasons discussed above, BCSB did not act with deliberate indifference to Doe's constitutional rights under §1983 or Title IX and is therefore entitled to summary judgment on Counts I and III.  There was no obvious need for BCSB to train its employees to investigate sexual misconduct complaints, therefore it is entitled to summary judgment on Count II.  Finally, Scavella is entitled to qualified immunity because there is no causal connection between Scavella's actions and Doe's deprivation.  Therefore, it is hereby

ORDERED that

(1)    Sam Scavella's Motion for Summary Judgment [48] is GRANTED as to Count IV.

(2)    Broward County School Board's Motion for Summary Judgment [51] is GRANTED as to Counts I, II, and III.

(3)    The state law claims, Counts V, VI, and VII, are DISMISSED WITHOUT PREJUDICE as the Court declines to exercise supplemental jurisdiction.

(4)    All pending motions are DENIED as MOOT.

(5)    This case is CLOSED.

DONE AND ORDERED at Miami, Florida, this 23rd day of December, 2008.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

Copies to:
Magistrate Judge O'Sullivan
Counsel of Record

-27-